UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TOMMY DORSEY FLOWERS,

                        Petitioner,

v.                                      CASE NO. 10-13303
                                      HONORABLE NANCY G. EDMUNDS

WARDEN LINDA TRIBLEY,

                        Respondent.

_____/

## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS,
## GRANTING IN PART A CERTIFICATE OF APPEALABILITY,
## AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS*

       Petitioner Tommy Dorsey Flowers has filed a *pro se* habeas corpus petition under

28 U.S.C. § 2254. The petition challenges Petitioner's convictions for assault with intent

to do great bodily harm less than murder and three firearm offenses. Respondent Linda

Tribley urges the Court to deny the petition. The Court has determined from a review of

the pleadings and record that Petitioner's claims do not warrant habeas relief. Accordingly,

the petition is **DENIED**. A procedural history and discussion follow.

## I.  BACKGROUND

**A.  The State Court Proceedings**

       Petitioner was charged in an amended criminal information with armed robbery,

MICH. COMP. LAWS § 750.529, assault with intent to do great bodily harm less than murder,

MICH. COMP. LAWS § 750.84, felon in possession of a firearm, MICH. COMP. LAWS § 750.224f,

carrying a concealed weapon (CCW), MICH. COMP. LAWS § 750.227, and possession of a

firearm during the commission of, or attempt to commit, a felony (felony firearm), MICH. COMP. LAWS § 750.227b. He was tried jointly with Gordon Flowers, his brother and co-defendant, in Genesee County Circuit Court. The state court summarized the testimony at the jury trial as follows:

> In the early morning of November 24, 2007, the victim was badly beaten outside a social club and eatery in Flint. The victim testified that he parked his vehicle in the parking lot behind a gray Dodge Stratus with a personalized license plate. As the victim walked toward the club, a passenger in the Stratus asked the victim if he left enough room for the Stratus to pull out. The victim responded affirmatively. The passenger in the Stratus, identified as defendant, answered with an obscenity, and the victim responded in a similar manner and continued walking. Defendant exited the passenger side of the Stratus and called to someone across the street in a burgundy "Eddie Bauer" Expedition to join him. Defendant approached the victim with a handgun, put the gun to the victim's chest, and questioned him about his comments. Meanwhile, defendant's brother, codefendant Gordon Flowers, had run across the street from the Expedition, stood next to the victim, and joined defendant in menacing the victim. The victim did not respond. Defendant then repeatedly hit the victim with the gun, while the codefendant repeatedly hit the victim with his fists. The victim testified that after the five-minute thrashing, codefendant Gordon snatched his diamond neck chain and the two defendants fled in the Expedition.
>
> The victim went inside the club, called 911, and was eventually taken to the hospital. The victim testified that he gave the police a description of the two vehicles at the scene. Approximately a week after the incident, the victim told an associate about the Expedition and the associate gave him the street name and address of the person who drove the Expedition. In turn, the victim gave the information to the police. The police subsequently observed the vehicle at the residence and later saw the codefendant in the vehicle. An officer testified that the victim identified each defendant in their respective photographic arrays in a "split second." The victim also identified each defendant at a corporeal lineup. The police discovered that defendant's girlfriend owned a 2002 Dodge Stratus with a personalized license plate, and that the defendants' mother owned a 1997 burgundy Expedition. The Ford Expedition was seized from the codefendant's residence.
>
> The defense theory was that the victim had misidentified his assailants, and in furtherance of that theory defendant presented alibi witnesses who testified that he was with them at a birthday party on the night of the incident. Defendant's witnesses also stated that defendant was driving

2

his own Suburban truck that evening.

*People v. Flowers*, No. 285887, 2009 WL 3365763, at *1 (Mich. Ct. App. Oct. 20, 2009) (unpublished).

On April 25, 2008, the jury acquitted Petitioner of armed robbery, but found him guilty, as charged, of assault with intent to commit murder, felon in possession of a firearm, CCW, and felony firearm.  The trial court sentenced Petitioner as follows:  forty-seven months to fifteen years in prison for the assault conviction; 28 months to seven and a half years in prison for the felon-in-possession and CCW convictions; and a consecutive term of two years in prison for the felony firearm conviction.

Petitioner raised his habeas claims in an appeal as of right.  The Michigan Court of Appeals affirmed his convictions and sentence in an unpublished, *per curiam* opinion, *see id.*, and on March 29, 2010, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  *See People v. Flowers*, 779 N.W.2d 808 (Mich. 2010).

**B.  The Habeas Petition and Responsive Pleading**

On August 20, 2010, Petitioner filed his habeas corpus petition.  He claims that:  (1) the pretrial lineup procedure was unduly suggestive; (2) the in-court identification of him was based on an improper pretrial identification procedure; (3) he was denied a fair trial by the introduction of evidence regarding other crimes and bad acts; (4) the prosecution failed to give the required notice of intent to introduce evidence of other crimes, and the trial court failed to give a cautionary jury introduction on the evidence; (5) defense counsel was ineffective for (a) failing to object to (i) the introduction of evidence of other crimes and bad acts and  (ii) the prosecution's failure to give the required notice and (b) not requesting a

3

cautionary jury instruction on other acts evidence; (6) defense counsel was ineffective for failing to (a) challenge the tainted in-court eyewitness identification and (b) request appointment of an expert witness on eyewitness identification; (7) the trial court deprived him of due process by admitting hearsay statements of identification, and defense counsel was ineffective for failing to object to the hearsay; and (8) the cumulative effect of errors deprived him of a fair trial and due process of law.  Because Petitioner did not file a supporting brief, the Court has looked to his state appellate brief for a fuller understanding of his claims.

Respondent argues in an answer to the habeas petition that claims three and seven and a portion of claim four are procedurally defaulted because Petitioner failed to make a contemporaneous objection to the alleged errors at trial.  Respondent maintains that the remaining claims lack merit, are not cognizable on habeas review, or were adjudicated by the Michigan Court of Appeals in a reasonable manner.

A procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997).  While it is true that the Michigan Court of Appeals reviewed some of Petitioner's claims for "plain error" because he failed to raise the issues in the trial court, the presence of a procedural default does not deprive a federal court of jurisdiction.  *Id.*  A prisoner may obtain relief on a procedurally-defaulted claim if he or she "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  The petitioner "must also show that the claims are meritorious." *Babick v. Berghuis*, 620 F.3d 571, 576 (6th Cir. 2010), *cert. denied*, __ U.S. __, 131 S. Ct. 2121 (2011).  As in

4

*Babick v. Berghuis*, the court "cut[s] to the merits here, since the cause-and-prejudice analysis adds nothing but complexity to the case." *Id.*

## II. STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, state prisoners are not entitled to the writ of habeas corpus unless the state court's adjudication of their claims on the merits

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541

5

U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

### III.  DISCUSSION

**A.  The Pretrial Lineup and In-Court Identification** (claims one and two)

Petitioner alleges that he was denied due process by testimony concerning the victim's identification of him at a pretrial lineup. Petitioner contends that the lineup was unduly suggestive and, as a result, there should have been no testimony about the pretrial identification, and the victim should not have been permitted to identify him at trial.

Defense counsel moved to suppress the victim's pretrial identification of Petitioner, but, at an evidentiary hearing on the motion, she withdrew her challenge to the victim's identification of Petitioner in a photo array. She nevertheless maintained that the live lineup was impermissibly suggestive because the same people who were used as "foils" in co-defendant Gordon Flowers' lineup were used in Petitioner's lineup.

The trial court concluded at the close of the hearing that the police did not appear to use any impermissibly suggestive procedures at the lineup. The trial court also stated that, if there were any impermissibly suggestive identification procedures, there was an independent basis for the victim's identification of Petitioner. The Michigan Court of Appeals determined that the record supported the trial court's findings that no

6

impermissible or unduly suggestive identification procedure was used and that there was

an independent basis for the victim's in-court identification

### 1.  Clearly Established Federal Law

"The Constitution . . . protects a defendant against a conviction based on evidence

of questionable reliability . . . ."  *Perry v. New Hampshire*, __ U.S. __, __, 132 S. Ct. 716,

723  (2012).  "Most eyewitness identifications involve some element of suggestion," *id.* at

727, but

> [a]n identification infected by improper police influence . . . is not
> automatically excluded.  Instead, the trial judge must screen the evidence for
> reliability pretrial.  If there is "a very substantial likelihood of irreparable
> misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct.
> 967, 19 L. Ed. 2d 1247 (1968), the judge must disallow presentation of the
> evidence at trial.  But if the indicia of reliability are strong enough to outweigh
> the corrupting effect of the police-arranged suggestive circumstances, the
> identification evidence ordinarily will be admitted, and the jury will ultimately
> determine its worth.

*Id.* at 720.  An identification procedure is impermissibly suggestive if the procedure "made

it all but inevitable that [the victim] would identify petitioner whether or not he was in fact

'the man.'"  *Foster v. California*, 394 U.S. 440, 443 (1969).  To obtain relief, the petitioner

must demonstrate that the procedure "so undermined the reliability of the eyewitness

identification as to violate due process."  *Id.*

Courts in this Circuit use a two-part analysis to determine whether an identification

procedure was so impermissibly suggestive as to give rise to a substantial likelihood of

irreparable misidentification:

> The court first considers whether the procedure was unduly suggestive.
> *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001); *Ledbetter v. Edwards*,
> 35 F.3d 1062, 1070-71 (6th Cir. 1994).  The court must decide if the
> procedure itself steered the witness to one suspect or another, independent
> of the witness's honest recollection.  *Wilson*, 250 F.3d at 397.  "The

7

defendant bears the burden of proving this element." *Ledbetter*, 35 F.3d at 1071 (citation omitted). If the procedure was suggestive, the court then determines whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible. *Wilson*, 250 F.3d at 397 (citation omitted); *Ledbetter*, 35 F.3d at 1071.

*Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009), *cert. denied sub nom Cornwell v. Bobby*, __ U.S. __, 130 S. Ct. 1141 (2010).

## 2. The Lineup

The record indicates that, on January 28, 2008, the victim was called to the jail to view a line-up of six men in co-defendant Gordon Flowers' case. He identified Gordon Flowers in the lineup. On January 31, 2008, the victim viewed a lineup in Petitioner's case to determine if he could identify the other suspect. Petitioner's line-up included four or five men who also appeared in the lineup conducted in Gordon Flowers' case three days earlier.[1] The reason for using the same men was that the police officer who conducted the lineup had difficulty finding men who were similar in height and weight to the two suspects. Petitioner was simply substituted for his brother in the second lineup. Petitioner claims that this procedure tainted the objectivity of the lineup and made it unduly suggestive because, in his opinion, the victim obviously ruled out the same "foils" or other individuals in his brother's lineup.

The Court has found no Supreme Court case holding that a defendant's lineup is impermissibly suggestive if it contains the same individuals that appeared in the co-

---

[1] At the suppression hearing, the police officer who conducted the lineup testified that he used the same *five* people in both Petitioner's and his brother's lineups. (Suppression Hr'g, 31-32, Apr. 17, 2008.) At trial, the officer testified that there were six people in Petitioner's lineup and that *four* of the same people appeared in Gordon Flowers' lineup. (Trial Tr., Vol. 1, 314-15, Apr. 23, 2008.)

defendant's lineup.  Furthermore, it appears from the record that the lineup was not inherently unfair.  The attorney who viewed Petitioner's lineup for fairness testified at the suppression hearing that all the men in the lineup were dressed similarly in jail attire and that they were similar in height and body build.  The attorney did not recall whether she was informed that there was a previous lineup in the case earlier that week, but she had no objection to the individuals selected for the lineup.  In fact, she thought that one person in the lineup actually looked much like Petitioner.  (Suppression Hr'g, 11, 17-18, Apr. 17, 2008.)

The victim, moreover, testified at the suppression hearing that, although he looked at all the faces in the first lineup, he did not look at each individual face in the second lineup, because he recognized the person who had approached him with a gun.  He claimed to have identified Petitioner before viewing the entire lineup.  And when defense counsel asked the victim whether he recalled seeing some of the same people in both lineups, the victim stated that he was not paying attention to that.  (*Id.* at 53-56.)

The Court concludes that using some or all of the same individuals in both lineups did not made it all but inevitable that the victim would identify Petitioner.  The victim apparently had an honest recollection of Petitioner's face and did not bother to look at all the men in the second lineup.  Therefore, the lineup procedure was not impermissibly suggestive, and it did not undermine the reliability of the victim's identification to the extent that it violated due process.

### 3.  Independent Basis

Even if the lineup were unduly suggestive, the question would be "whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore

9

admissible." *Cornwell v. Bradshaw*, 559 F.3d at 413. The following five factors must be considered when determining whether an identification was reliable despite the suggestiveness of the confrontation procedure: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the witness's level of certainty at the time of the identification; and (5) the length of time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199 (1972).

### a. opportunity to view the criminal

The first *Biggers* factor is the witness's opportunity to view the criminal at the time of the crime. The victim testified at the suppression hearing and at trial that he saw Petitioner's entire face and got a good view of it. (Suppression Hr'g, 59, Apr. 17, 2008; Trial Tr. Vol. 1, 184, 229, Apr. 23, 2008.) The record, moreover, supports the state appellate court's findings that

> [t]he area was amply lit, and the victim had an opportunity to observe [Petitioner] while he was in the car about five yards away, as defendant approached him on the sidewalk, and as [Petitioner] stood right next to him. The victim explained that as [Petitioner] pointed the gun at his chest, [Petitioner's] face was almost level with the barrel and [Petitioner] was only a foot away. The victim "saw his face a good 30 or 45 seconds" before he was struck. Although [Petitioner] was wearing a hood, there was nothing covering his face.

*Flowers*, 2009 WL 3365763, at *3. The Court concludes that the first *Biggers* factor is satisfied because the victim had a good opportunity to view the gunman.

### b. degree of attention

The second *Biggers* factor is the witness's degree of attention during the crime. The victim admitted that he drank about three alcoholic beverages between 11:00 p.m. and 1:00

10

a.m. on the night of the incident.  He also admitted that the incident scared him and that he

was a "little groggy" afterward, but he claimed that he was "focused on what was in front

of [him]" during the actual incident and that the "one thing [he knew was] what the face

looked like."  (Trial Tr. Vol. 1, 218-19, 226-27, 229, Apr. 23, 2008.)  The Court concludes

from this testimony that the victim was attentive during the crime.

### c. accuracy of a prior description

The third *Biggers* factor is the accuracy of the witness's prior description of the

criminal.  The victim described the first suspect to the police as a black male, dark skinned,

approximately six foot three, and over thirty-five years of age, possibly thirty-five to thirty

seven years old.  (*Id.* at 277-78.)  There is nothing in the record to suggest that this

description did not match Petitioner's actual appearance.  In fact, an officer described

Petitioner as 6'1" to 6'3" tall (Suppression Hr'g, 34, Apr. 17, 2008), and the Court estimates

that Petitioner was thirty-eight years old at the time of the crimes.[2]  It is also worth noting

that the victim

> had previously identified [Petitioner] in a photographic array.  The victim
> made no incorrect identifications, and never identified anyone other than
> [Petitioner] as the gunman.  Although the victim did not provide any special
> identifying characteristics of [Petitioner], there was no evidence that
> [Petitioner] had any unusual characteristics about his appearance that the
> victim should have noticed, such as visible birthmarks, scars, or tattoos.

*Flowers*, 2009 WL 3365763, at *3.  The Court therefore concludes that the victim's prior

description of the suspect was accurate.

### d.  level of certainty

---

[2]  The judgment of sentence states that Petitioner's date of birth is May 21, 1969.
*See* Judgment of Sentence, ECF No. 8-7, p. 14.  The crime occurred on November 24,
2007.

The fourth *Biggers* factor is the witness's level of certainty at the time of the identification. The victim testified at trial that he identified Petitioner "right away" in the photo array, and the officer who showed him the array testified that the identification occurred in a "split second;" it was "very short" and not "long at all." (Trial Tr., Vol. I, 206, 265, Apr. 23, 2008).

The live lineup identification also was "extremely quick." (Suppression Hr'g, 14, Apr. 17, 2008.) The victim identified Petitioner in the third position and said something like, "I don't have to look no more." (*Id.* at 14 and 53-54.) He explained at the suppression hearing that it had not been necessary to view the entire lineup because he recognized the man who assaulted him with a gun. (*Id.* at 53-54.) He also said that he would never forget Petitioner's face and that his face was "as clear as day." (*Id.* at 52 and 54.)

The victim made a similar comment at trial, stating that Petitioner had come right up to him and that Petitioner had a face he would never forget. (Trial Tr. Vol. 1, 183, Apr. 23, 2008.) The Court concludes from these comments that the victim was certain of his identification.

### e.  length of time

The fifth and final *Biggers* factor is the length of time between the crime and the identification. The crime occurred on November 24, 2007, and the lineup occurred slightly more than two months later on January 31, 2008. Even "[t]hree months is not a great length of time between an observation and identification," *Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005), and "[a] three to four-month delay between the crime and the identification does not render the identification inherently unreliable." *United States v. Causey*, 834 F.2d 1277, 1286 (6th Cir. 1987). It follows that the shorter two-month delay

12

in this case did not render the identification inherently unreliable.

To summarize, the victim had a good opportunity to view Petitioner at the time of the crime, and he was paying attention.  He was certain of his identifications at the photo show-up and at the subsequent live lineup, and the time between the crime and the identifications was not lengthy.  The Court therefore concludes that there was an independent basis for the victim's identification of Petitioner, and the identification was reliable.

### 4.  The Trial Court's Conduct

Petitioner claims that the victim's in-court identification of him was tainted by the trial court's suggestion to the victim at the pretrial suppression hearing that Petitioner was the "one sitting here in the orange shirt."  This comment must be viewed in context.  It occurred during the prosecutor's direct examination of the victim at the suppression hearing.  The examination went as follows:

Q  [by the prosecutor]  With relation to - the person that had the gun to you, do you see him here in Court here today?

A  [by the victim]  Yes, I do.

Q  Point him out for - for the record[.]

A  The gun [sic] in the orange shirt right there (pointing).

Q  Okay.

[The prosecutor]: Your Honor, for purposes of this hearing, I'd request identification by our victim of the Defendant, Tommy Flowers.

THE COURT:  Yes.  I want him now to tell me which one was Tommy Flowers though, which of the two?

THE WITNESS:  Tommy Flowers is the guy with the gun.

THE COURT:  And he's the one sitting here in the -

13

THE WITNESS:  Sitting right here at the - at the - with the orange -

THE COURT:  - orange shirt?

THE WITNESS:  Yes, ma'am, with the orange shirt there.

(Suppression H'rg, 49-50, Apr. 17, 2008.)

The victim had already identified Petitioner as the gunman before the trial court made its comment about the man in the orange shirt.  Furthermore, the victim had previously identified Petitioner in a photo array and at the lineup.  The Court therefore finds that the trial court's comment at the suppression hearing did not taint the victim's identification of Petitioner.  The Court agrees with the Michigan Court of Appeals that Petitioner's claim lacks merit.

### 5.  Conclusion on Petitioner's Identification Claims

The Michigan Court of Appeals concluded that the pretrial identification procedure was not unduly suggestive, that there was an independent basis for the victim's identification, and that the trial court's comment at the suppression hearing did not taint the victim's in-court identification of Petitioner.  For all the reasons given above, these conclusions were not contrary to, or unreasonable applications of, Supreme Court decisions on eyewitness identification.  Nor were the state court's conclusions based on an unreasonable determination of the facts.  Petitioner therefore has no right to relief on the basis of his challenges to the lineup and the victim's in-court identification of him.

### B.  Other Acts Evidence (claims three and four)

Petitioner alleges next that he was denied a fair trial by the introduction of evidence of alleged crimes and bad acts involving drugs and weapons.  Petitioner contends that the

14

evidence was unduly prejudicial and not necessary to prove his identity.  He also contends that, even if the evidence were admitted for a proper purpose, the trial court failed to consider whether the probative value of the evidence was outweighed by unfair prejudice.

Petitioner further alleges that the prosecution failed to give notice of intent to introduce evidence of other crimes and bad acts, as required by the Michigan Rules of Evidence, and the trial court should have instructed the jury on the proper use of the evidence.  Petitioner contends that he was first confronted with the evidence at trial and, without proper notice, there was no way he could properly defend against the inferences of wrongdoing and criminality.

The Michigan Court of Appeals reviewed Petitioner's claims for "plain error" because he did not object in the trial court.  The Court of Appeals then thoroughly discussed Petitioner's arguments and concluded that his unpreserved claims did not warrant reversal.

### 1.  Legal Framework

In Michigan,

(1)  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

(2) The prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial and the rationale . . . for admitting the evidence . . . .

Mich. R. Evid. 404(b).

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the

court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

Mich. R. Evid. 105.

Petitioner's contention that these rules were violated is not a cognizable claim on federal habeas corpus review, *Hall v. Vasbinder*, 563 F.3d 222, 239 (6th Cir. 2009), because "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Moreover,

> [t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence . . . .  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988), it has not explicitly addressed the issue in constitutional terms.

*Bugh v. Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003).  Consequently, there is no Supreme Court precedent to which the state court's decision is contrary.  Petitioner's disagreement with the state court's ruling on "other acts" evidence involves no constitutional dimension and is not cognizable on federal habeas review.  *Bey v. Bagley*, 500 F.3d 514, 523 (6th Cir. 2007).

### 2.  On the Merits

Even if the alleged errors rose to the level of a constitutional violation, habeas petitioners generally

> are not entitled to relief based on a constitutional error at trial unless "they can establish that it resulted in 'actual prejudice.' " *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (citing *United*

16

> *States v. Lane*, 474 U.S. 438, 449, 106 S. Ct. 725, 88 L. Ed.2d 814 (1986));
> *see Fry v. Pliler*, 551 U.S. 112, 121, 127 S. Ct. 2321, 168 L. Ed. 2d 16 (2007)
> (stating that the *Brecht* standard of review is still applicable post-AEDPA).
> Actual prejudice is present when the "error 'had substantial and injurious
> effect or influence in determining the jury's verdict.' " *Brecht*, 507 U.S. at
> 623, 113 S. Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776,
> 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)).

*Gover v. Perry*, 698 F.3d 295, 299 (6th Cir. 2012).

> The disputed evidence here consisted of:
>
> Sergeant Laurence Muddy's testimony that one of the suspects was recently
> released from prison and that "there may be narcotics being sold out of his
> residence." (Trial Tr. Vol. 1, 302, Apr. 23, 2008);
>
> Lieutenant Terence Green's testimony that "the name T-Flow came across
> [his] desk in a narcotic investigation." (*Id.* at 275); and
>
> Sergeant Muddy's testimony that he did a criminal history workup on the
> suspects and that "they fit the criteria to be charged federally, being that a
> gun was involved. (*Id.* at 300-01).

Petitioner contends that these references to other acts were either unrelated to the charges

in his case or were too vague to be compared to the charges.

The comment that "there may be narcotics being sold out of his residence" appears

to have been a reference to Petitioner's brother.[3]  And the comment that "the name T-Flow

came across [Lieutenant Green's] desk in the context of a narcotics investigation" was

elicited by Petitioner's attorney during her cross-examination of Lieutenant Green.  "When

a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus

relief for that error." *Fields v. Bagley*, 275 F.3d 478, 486 (6th Cir. 2001) (citing *Leverett v.*

---

[3] Petitioner admits as much in his state appellate brief.  *See* Appellant's Brief on
Appeal 41, ECF No. 8-7 (stating in the argument about defense counsel's failure to
object to hearsay that "the jury heard hearsay information that co-Defendant was
recently released from jail or prison and he was suspected of operating a drug house").

*Spears*, 877 F.2d 921, 924 (11th Cir. 1989), and *Draughn v. Jabe*, 803 F. Supp. 70, 75 (E.D. Mich. 1992)); *see also All American Life and Cas. Co. v. Oceanic Trade Alliance Council Int'l, Inc.,* 756 F.2d 474, 479-80 (6th Cir. 1985) (explaining that, "[u]nder the 'invited error' doctrine, it is an accepted matter of law that where the injection of allegedly inadmissible evidence is attributable to the action of the party seeking to exclude that evidence, its introduction does not constitute reversible error"). Consequently, the comment that the name "T-Flow" (Petitioner's street name) came across Lieutenant Green's desk does not constitute reversible error.

The statement that Sergeant Muddy reviewed the suspects' criminal history did not prejudice Petitioner because Sergeant Muddy did not reveal the results of his search. Furthermore, Petitioner conceded, for purposes of the felon-in-possession count, that he had a prior conviction, and his fiancee testified that Petitioner was arrested on another matter. (Trial Tr. Vol. II, 20, Apr. 24, 2008.)

The final disputed comment was that Petitioner fit the criteria for being charged with a federal crime due to a gun being involved in the crime. The fact that Petitioner could have been charged under federal law due to a gun being involved in the crime did not prejudice him because he was on trial for three state crimes involving a firearm or weapon.

For all the reasons given above, the references to narcotics, to a criminal history check, and to the gun could not have a substantial and injurious effect or influence on the jury's verdict. Therefore, even if the admission of "other acts" evidence deprived Petitioner of his constitutional right to due process, the error was harmless.

**C.  Hearsay** (claim seven)

    **1.  Petitioner's Allegations and the State Court's Decision**

18

Petitioner alleges the trial court deprived him of due process by admitting hearsay, which is presumptively unreliable.  He contends that no exception to the hearsay rule applied in his case.

The alleged hearsay came from the victim, from Sergeant Muddy, and from Lieutenant Green. The victim testified that a man named Mack called him about the incident, and when the victim described the vehicle involved in the crime to Mack, Mack described the first suspect and said his name was "T-Slow."  According to the victim, Mack also said that "T-Slow" had a brother who recently got out of jail and they lived in the Beecher area.  The victim called Lieutenant Green and informed him what he had learned from Mack.  (Trial Tr. Vol. I, 202-05, Apr. 23, 2008.)

Sergeant Muddy testified that he received information about  two suspects.  He learned that the suspects possibly were brothers, that one of them recently got out of prison, and that there may be narcotics sold out of his residence.  (*Id.* at 302.)  Lieutenant Green testified that he acquired information that one of the suspects was "T-Flow" and that the suspects were possibly related.  He disseminated the information and was then able to identify Petitioner as "T-Flow."  (*Id.* at 260-61.)

"Mack" apparently was the source of all the information about the suspects' identity, but he did not testify at trial, and Petitioner correctly points out that the jury was not told how Mack acquired the information which he passed on to the victim.  Petitioner further alleges that the information was faulty because the tipster informed the victim that "T-Slow" was involved, whereas Lieutenant Green investigated a "T-Flow."

The Michigan Court of Appeals reviewed Petitioner's claim for "plain error" because Petitioner did not object to the evidence in the trial court.  The Court of Appeals then

19

analyzed the challenged statements and determined that they were not hearsay, because they were not offered to prove the truth of the matters asserted, namely, that "T-Flow" or "T-Slow" and his brother assaulted the victim.[4]  According to the Court of Appeals,

> the statements were offered to explain the course and chronology of the police investigation.  This was relevant because the victim was not familiar with the defendants or their names before this incident, and the victim's subsequent identification was the crux of the case.

*Flowers*, 2009 WL 33655763, at *9 (internal citation omitted).

### 2. Analysis

The alleged violation of the State's hearsay rules is not a basis for habeas relief, because "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. at 68. Further, "[a] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey,* 546 U.S. 74, 76 (2005).

Petitioner has not alleged that his Sixth Amendment right of confrontation was violated.[5]  Even assuming that the disputed statements were testimonial and that Petitioner is alleging a violation of the Confrontation Clause, the Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter

---

[4]  "Hearsay" is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Mich. R. Evid. 801(c).

[5]  The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  The Amendment is applicable to the States through the Fourteenth Amendment.  *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n. 9 (2004). Stated differently, "to constitute a Confrontation Clause violation, 'the statement must be used as hearsay – in other words, it must be offered for the truth of the matter asserted.'" *United States v. Davis*, 577 F.3d 660, 670 (6th Cir. 2009) (quoting *United States v. Gibbs*, 506 F.3d 479, 486 (6th Cir. 2007)).

The Michigan Court of Appeals determined that the disputed statements were not hearsay because they were offered to explain relevant information about the course and chronology of the police investigation. This conclusion is entitled to deference. *Gover v. Perry*, 698 F.3d at 304-05. The Sixth Circuit Court of Appeals, moreover, has determined in some instances that statements offered only to provide background information and to explain how and why law enforcement officials became involved with a particular defendant are admissible nonhearsay. *Id.* at 306 (quoting *United States v. Aguwa*, 123 F.3d 418, 421 (6th Cir. 1997)).

This Court finds it unnecessary to decide whether the challenged statements were admissible nonhearsay, because the alleged errors in admitting the evidence could not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. at 776). The victim was convinced that Petitioner was the man who approached him with a gun and beat him. The victim

> also identified both defendants in photographic arrays "right away" and in corporeal lineups. The victim explained that he was within 8 to 12 inches of the perpetrators during the five-minute assault, could clearly see [Petitioner's] face, and that [Petitioner] was standing "right up in front" of him with the gun at his chest. Testimony and photographic evidence was presented showing that the parking lot was well illuminated. The victim also described [Petitioner] as being in a gray Dodge Straus (sic) with a personalized license

21

> plate, and evidence revealed that such a car belonged to his girlfriend.  Also,
> the victim testified that the defendants fled in a Ford Expedition, and the
> same type of vehicle was seized from [their mother's] residence.

*Flowers*, 2009 WL 3365763, at *10.

Although Petitioner asserted an alibi defense, his alibi witnesses consisted of his fiancee and her friends or relatives.  The jury could have concluded that the defense witnesses were biased in Petitioner's favor due to their close relationship to Petitioner.

Finally, as the Michigan Court of Appeals recognized, "[t]o the extent that the challenged testimony went beyond simply explaining the police investigation and improperly referencing that one suspect was recently released from prison and that narcotics were possibly being sold out of the residence," the error was not outcome determinative.  *Id*. The reference to narcotics was brief, and "the prison reference was not prejudicial because [Petitioner] had already stipulated that he had previously been convicted of a felony."  *Id*.

Due to the strength of the evidence against Petitioner, the Court does not have a "grave doubt" about whether the alleged errors had a substantial and injurious effect or influence on the jury's verdict.  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  The alleged errors, therefore, were harmless, and the Court declines to grant relief on the basis of Petitioner's hearsay claim.

## D.  **Defense Counsel** (claims five, six, and part of seven)

Petitioner alleges that defense counsel was ineffective for failing to:  (1) object to evidence of other crimes and bad acts; (2) object to the prosecution's failure to give the required notice of intent to introduce evidence of other crimes and bad acts; (3) request a cautionary jury instruction on evidence of other crimes and bad acts; (4) object to a tainted in-court eyewitness identification of him; (5) request appointment of an expert witness on

eyewitness identification; and (6) object to hearsay statements of identification.  Petitioner contends that the asserted instances of ineffectiveness pertain to issues of momentous importance and that counsel's errors cannot be deemed trial strategy.

The Michigan Court of Appeals found no merit in Petitioner's claims about trial counsel.  According to the Court of Appeals, there was not a reasonable probability that, but for counsel's conduct or inaction, the result of the proceeding would have been different, and, therefore Petitioner failed to establish a claim of ineffective assistance of counsel.

### 1.  Clearly Established Federal Law

To prevail on his ineffective-assistance-of-counsel claims, Petitioner must demonstrate that his attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland v. Washington*, 466 U.S. at 693).  "The

23

standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id.* at 788 (internal and end citations omitted).

## 2. Application

### a. Identification

#### i. The Failure to Object to the In-Court Identification

Petitioner claims that defense counsel should have objected to the victim's in-court identification of him because identification was the critical issue and the in-court identification was tainted by a suggestive pretrial identification procedure. Petitioner points out that there was no physical evidence linking him to the assault and there were no independent eyewitnesses placing him near the victim or the scene of the crime.

As previously explained, defense counsel did attempt to suppress the pretrial identification of Petitioner. The trial court, however, determined that the lineup was not impermissibly suggestive and that there was an independent basis for the victim's identification of Petitioner. Because the trial court denied defense counsel's motion to suppress testimony about the pretrial identification, it would have been futile to object to the identification at trial on the basis that it was tainted by a suggestive pretrial identification. "[F]ailing to make a futile motion is neither unreasonable nor prejudicial." *Jacobs v. Sherman*, 301 F. App'x 463, 470 (6th Cir. 2008) (citing *Strickland v. Washington*, 466 U.S. at 687).

#### ii. The Failure to Request Appointment of an Expert Witness

The next question is whether trial counsel was ineffective for failing to request appointment of an expert witness on eyewitness identification. Petitioner contends that he

24

would have been entitled to an expert witness and that a defense expert was critical because the outcome of the trial hinged on whether the jury accepted the victim's identification.  Petitioner contends that an expert witness could have pointed out that there is little correlation between a witness's confidence and accuracy and that the stress of the incident likely rendered the victim's identification unreliable.

The Sixth Circuit Court of Appeals recently explained that,

[t]rial counsel renders ineffective assistance when he "fails adequately to investigate, and to introduce into evidence, information that demonstrates his client's factual innocence, or that raises sufficient doubts as to that question to undermine confidence in the verdict." *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) (quoting *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006)). The Supreme Court has acknowledged "the dangers inherent in eyewitness identification," *United States v. Ash*, 413 U.S. 300, 329, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) (quoting *United States v. Wade*, 388 U.S. 218, 235, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)), and [the Sixth Circuit has] noted that "eyewitness misidentification accounts for more false convictions in the United States than any other factor." *Forensic v. Birkett*, 501 F.3d 469, 478 (6th Cir. 2007). In *Forensic*, [the Sixth Circuit] also explained that eyewitness identification expert testimony is "universally recognized as scientifically valid and of 'aid to the trier of fact' for admissibility purposes." *Id.* at 482 (quoting *United States v. Smithers*, 212 F.3d 306, 315 (6th Cir. 2000)).

*Jackson v. Bradshaw*, 681 F.3d 753, 762-63 (6th Cir. 2012), *cert. denied*, __ U.S. __, 133 S. Ct. 983 (2013).

That said, "'a habeas petitioner does not have a constitutional right to the presentation of expert testimony on the reliability of eyewitness identification,'" *Moreland v. Bradshaw*, 699 F.3d 908, 923-24 (6th Cir. 2012) (quoting *Buell v. Mitchell*, 274 F.3d 337, 359 (6th Cir. 2001), and the victim's testimony in this case was not the only incriminating evidence against Petitioner.  There was evidence that the gray Dodge Stratus in which Petitioner was seated before the assault belonged to his girlfriend and that the Ford Expedition parked near his brother that night belonged to their mother.

25

Furthermore, even though Petitioner's attorney did not request appointment of an expert witness, both defense attorneys made a concerted effort to demonstrate their clients' innocence and to raise a reasonable doubt. In addition to presenting six alibi witnesses for Petitioner, his attorney and co-defendant Gordon Flowers' attorney

> [t]hrough cross-examination and other evidence, . . . were able to challenge the strength and reliability of the victim's identification testimony, and elicit apparent discrepancies and arguable bases for questioning the accuracy of the victim's identification.
>
> Counsel elicited that the victim had three servings of vodka that evening, with his last drink being only 30 minutes before the incident. The victim acknowledged that after the beating, he was disoriented and woozy because of the impact of the blows to his head. Counsel noted the 911 call made immediately after the incident, elicited that the victim gave the operator a false name and stated that he could not describe the perpetrators, and questioned the victim's ability to later be able to provide an identification. Counsel also elicited that the victim told the Flint police, who first responded to the scene, that defendant was wearing a white T-shirt, but then subsequently claimed that defendant wore a black hooded jacket. Defense counsel elicited that the victim's testimony contradicted the initial police report in several other respects, including the number of times he was struck, the time of the incident, where he parked, and the year of the Expedition. Counsel also questioned an officer about the number of Ford Expeditions "out there." Given defendant's apparel as described by the victim, counsel cross-examined the victim about his ability to actually see defendant's face since he was wearing a hood. Defense counsel also cross-examined the victim and an officer about the lighting conditions outside at 1:30 a.m. In addition, defense counsel cross-examined the officer who conducted the photographic array, eliciting that all of the men in the photographs did not match defendant's complexion.

*Flowers*, 2009 WL 3365763, at *7. This Court agrees with the Michigan Court of Appeals that, "[b]ecause counsel was able to challenge the reliability and accuracy of the identification evidence through means of cross-examination and other evidence, [Petitioner] has failed to show that defense counsel was ineffective for failing to request the

appointment of an identification expert, or that he was prejudiced by the absence of such an expert at trial." *Id.*

### b. Other Acts and Hearsay Evidence

Petitioner contends that his attorney should have objected to evidence of other crimes and bad acts and to the prosecution's failure to give the required notice of intent to introduce the evidence. Petitioner also alleges that his attorney should have requested a cautionary jury instruction on evidence of other crimes and bad acts.

Petitioner further alleges that his attorney should have objected to hearsay concerning his identification. Petitioner states that the jury not only heard improper hearsay, which buttressed the victim's identification of him, but the jury also heard that his brother was recently released from jail or prison and was suspected of operating a drug house. Petitioner contends that the hearsay went beyond identification.

The Court determined above that the brief references to narcotics, criminal history checks, the criteria for federal gun charges, and a suspect's release from prison could not have a substantial and injurious effect or influence on the jury's verdict. Therefore, Petitioner was not prejudiced by his attorney's failure to object to the evidence or her failure to request a jury instruction on other crimes, wrongs, or acts. The failure to object to the alleged hearsay likewise did not prejudice Petitioner, given the strength of the victim's identification of Petitioner and the testimony linking Petitioner to the vehicles used in the crime.

### 3. Conclusion on Petitioner's Ineffective-Assistance-of-Counsel Claims

For all the reasons given above, there is not a substantial likelihood that the result of the trial would have been different had defense counsel objected to the in-court identification, to other acts evidence, or to alleged hearsay.  Nor is there a substantial likelihood that the result of the trial would have been different if defense counsel had requested appointment of an expert witness.  Consequently, defense counsel's allegedly deficient performance did not prejudice the defense, and the state appellate court's rulings on Petitioner's claims about trial counsel were not contrary to, or unreasonable applications of, *Strickland.*

### E.  Cumulative Effect of Errors (claim eight)

In his eighth and final claim, Petitioner alleges that he is entitled to a new trial because the cumulative effect of trial errors deprived him of a fair trial and due process of law.  The Michigan Court of Appeals rejected this claim, stating that reversal under a cumulative-error theory was unwarranted.

On habeas review, a claim that the cumulative effect of errors rendered a petitioner's trial fundamentally unfair is not cognizable.  *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)), *cert. denied sub nom Sheppard v. Robinson*, __ U.S. __, 132 S. Ct. 2751 (2012).  Therefore, Petitioner is not entitled to relief on the basis of his eighth claim.

### IV.  CONCLUSION

The decision of the Michigan Court of Appeals was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts.  Habeas relief is not warranted because the state appellate

court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. at 786-87. Accordingly, the petition for writ of habeas corpus [Doc. #1] is **DENIED**.

## V. CERTIFICATE OF APPEALABILITY;
## LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A habeas petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 1983)).

Reasonable jurists could debate the Court's resolution of Petitioner's claim that his attorney should have requested appointment of an expert witness on identification. Accordingly, the Court **GRANTS** a certificate of appealability on that aspect of claim six. The remaining claims do not deserve encouragement to proceed further, and reasonable jurists would not debate the Court's assessment of the claims. Accordingly, the Court

declines to issue a certificate of appealability on claims one through five, seven through

eight, and the portion of claim six that alleges defense counsel was ineffective for failing

to object to the in-court eyewitness identification of Petitioner.  Petitioner nevertheless may

proceed *in forma pauperis* on appeal without further authorization because he was

permitted to proceed *in forma pauperis* in this Court.  Fed. R. App. P. 24(a)(3).


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  March 28, 2013




I hereby certify that a copy of the foregoing document was served upon counsel of record
on March 28, 2013, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager